Laurie J. SHAW, Appellant (Plaintiff),

v.

Crayton SMITH; and Smith, Gosnell, Nicholson & Associates, a California corporation, Appellees (Defendants).

No. 97–236.

Supreme Court of Wyoming.

Sept. 28, 1998.

Jane A. Villemez and Bruce T. Moats, Cheyenne, for Appellant(Plaintiff).

Larry L. Jorgenson and Jessica Rutzick of Jorgenson Law Offices, Jackson; and William I. Goldstein, Encino, CA, for Appellee Crayton Smith.

Robert E. Schroth, Jackson; and S. Shane Sagheb, Encino, CA, for Appellee Smith, Gosnell, Nicholson & Associates.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

TAYLOR, Justice.

Appellant, Laurie J. Shaw (Shaw), accepted employment with a California corporation, Smith, Gosnell, Nicholson & Associates (SGN), at the request of its president and major shareholder, Crayton Smith (Smith). Several years later, Shaw began a live-in relationship with Smith that lasted for over nine years. When Shaw was removed from Smith's household and later terminated from her job, she filed claims against Smith for breach of express and implied contract and unjust enrichment, and a claim against SGN for wrongful termination. The district court dismissed SGN, ruling the corporation was not subject to personal jurisdiction, and later granted summary judgment in favor of Smith on Shaw's remaining claims.

Since Shaw presented a prima facie case showing that SGN's contacts with Wyoming were sufficient to establish jurisdiction, and finding evidence creating a genuine issue of material fact regarding Shaw's claims against Smith, we reverse and remand for further proceedings.

## I. ISSUES

Shaw presents the following issues for review:

1. Whether evidence of a cohabiting couple's agreement to share in the financial growth of their ten-year association and their conduct in maintaining a stable, mutually beneficial, family relationship requires a jury decision on the ultimate issues of the creation of an express contract or an implied contract.

2. Whether evidence of the parties' agreement to share equally in the control, direction and pecuniary outcome of their rental property enterprise requires a jury decision on the ultimate issue of the creation of a partnership or joint venture.

3. Whether one cohabitor is entitled to recover the reasonable value of her services to the other cohabitor, when she provides such services, in part, in exchange for his commitment to share equally in the financial growth of their association.

4. Whether Wyoming recognizes a claim for just and equitable division of property earned during a long, stable, non-marital, family relationship.

5. Whether a California corporation subjects itself to the personal jurisdiction of Wyoming courts by establishing an office in Wyoming, employing workers in Wyoming, and transacting business in Wyoming.

Appellee, Smith, states the issues as follows:

1. To create an express contract, Wyoming law requires, inter alia, (1) consideration and (2) a meeting of the minds. Is there a genuine issue of material fact as to the formation of an express contract between the parties where the terms of the contract are vague and unclear, and the evidence fails to show that the consideration for the contract was bargained for by both parties?

2. For an implied contract to exist proof of the intention of the parties is essential. Is there a genuine issue of material fact with regard to the formation of an implied contract between parties where the conduct of one party does not show an intention to enter into a contractual relationship?

3. Is Appellant entitled to recover the value of household services rendered during the period of the parties' cohabiting relationship where there is no contract between the parties and where the evidence does not reflect that Appellee had reason

* Chief Justice at time of oral argument.

to know that Appellant expected additional compensation for such services?

4. A partnership or joint venture is formed where the parties (1) have an equal right of control over the venture and (2) agree to share in both the profits and losses of the business endeavor. Is there a genuine issue of fact with regard to the formation of a joint venture where Appellant did not have the right to transfer or convey the investment properties and where Appellant admits that the parties did not agree that they would share in the profits and the losses associated with the investment properties?

5. Should the property acquired by one party during the period of a cohabiting relationship be treated as marital property upon dissolution of the relationship?

Appellee, SGN, presents one issue:

Whether a corporate officer/shareholder who telecommutes from the forum state may subject a foreign corporation to personal jurisdiction, particularly when the plaintiff's claim arises from the telecommuter's individual activities, as opposed to his corporate activities.

## II. FACTS

Pursuant to our standard of review, we present the facts in the light most favorable to Shaw. In 1979, Smith offered Shaw a job as an independent contractor for the Jackson, Wyoming office of his talent agency, SGN's predecessor. Shaw worked for Smith until 1984, when he moved the operations back to California. During 1984 and 1985, Smith repeatedly asked Shaw to move to California and work with him at SGN. Shaw contends she agreed after Smith told her he wanted to be equal partners in both business and in life.

Shaw moved to California and received compensation from SGN of $500.00 per week, $150.00 per week in expense money, use of a company car, credit card, telephone card, a pension plan, and health insurance. Initially, Shaw resided in Smith's home but did not share his bedroom. Between six months and a year later, their growing personal relationship resulted in a modification of the sleeping arrangements. After moving into Smith's bedroom, the couple lived as a family and Shaw assumed a primary role in raising Smith's two children. Throughout their relationship, Smith insisted Shaw's care of him and the children was one of her essential functions.

Smith provided financial resources for the household and repeatedly promised to "take better care of [Shaw] than anyone else could." Thus, Shaw's wages from SGN were not contributed to household expenses, but were retained for her personal needs and gifts for Smith, his children, and her family. In 1989, the couple returned to Jackson where Shaw continued to work for SGN in an office located in their home. In addition to her job at SGN and her household responsibilities, Shaw helped in the care and showing of Smith's prize Arabian horses. She also assisted Smith in the purchase and management of rental properties in Wyoming, California, and Arizona, with ownership of the properties held in the C. Crayton Smith Living Trust (the Living Trust). Shaw contributed her own funds to the purchase of only one of the properties. When her interest was later purchased by Smith at a profit to her, she invested the profit independently.

At some point in 1990, Shaw expressed to Smith her concern that his repeated promises of financial security were not sufficient protection. Smith responded by modifying the revocable Living Trust and creating the Charles Crayton Smith Irrevocable Trust # 2 (Trust # 2). Trust # 2 provided that in the event of Smith's death, Shaw would receive a distribution of income conditioned on the age of the children and the amount of time they resided with her. The Living Trust, which held the majority of Smith's assets, was amended to provide that if his children and all their descendants were deceased at the time of Smith's death, the trust would be terminated and seventy-five percent of the balance distributed to Shaw. The Living Trust was restated to name Shaw and two other persons as co-trustees in the event Smith was disabled, and Shaw was given a power of attorney to deposit assets or funds

into the Living Trust.[1]

Shaw contends that Smith explained he had changed the trust documents so that she was now an equal partner in his life and that half of everything was hers. She did not read the documents, relying on Smith's representations that they were voluminous, complicated, and could only be understood by a lawyer. Instead, Smith drew Shaw a diagram that she alleges showed her to have a fifty percent interest in the Living Trust. She also maintains Smith reassured her that she was now financially protected as if they were married.

Smith does not dispute that, at some point, he told Shaw "something to [the] effect" that these arrangements were "just the same as marriage as far as her financial protection." Shaw contends, based on her belief that the trust documents had memorialized Smith's oral agreement to make her his partner in life and his assurances that she was entitled to half of the property, she continued to assist his business efforts, maintain his household, and care for the children.

In November 1994, the relationship came to an abrupt end. Smith told Shaw he "needed space" and requested she stay with a friend in Santa Fe, New Mexico for a few weeks. He suggested she pack as if she were going on vacation for a month, drove her to Santa Fe, rented an apartment and furniture, and left. Shaw later learned that Smith hired a new assistant in Wyoming shortly after he left her in New Mexico. She continued to receive her check from SGN until April 27, 1995, but was not allowed to return to the office in Jackson. She never received official notification of termination.

Shaw filed her complaint against Smith and SGN on November 27, 1995. SGN responded with a motion to dismiss for lack of personal jurisdiction. After a hearing and review of the legal briefs and affidavits submitted by the parties, the district court held:

Defendant SGN's Motion to Quash Service of Summons and to Dismiss is based on the three prong Amoco test (*Amoco Production Company v. EM Nominee Partnership, Co.,* 886 P.2d 265, Wyo.1994). The Court agrees that SGN did not purposely avail itself of the privilege of doing business in Wyoming, SGN's activities are separate from Plaintiff's claims and SGN has only incidental and ancillary contact with the State of Wyoming not sufficient to exercise personal jurisdiction over SGN.

Smith's motion for summary judgment was heard approximately one year later. In its order granting the motion, the full text containing the district court's reasoning is as follows:

> If there are no genuine issues of material fact and the ultimate facts are uncontroverted Defendant is entitled to summary judgment. The ultimate facts in this case are uncontroverted. The Court finds Plaintiff and Defendant never entered into a contract either express or implied. There was no partnership agreement between the parties. Ms. Shaw took care of Defendant's family without expecting compensation. Nothing in the record shows that Defendant had any reason to believe Plaintiff expected additional renumeration [sic]. There was no evidence presented which shows the Plaintiff's distress rose to the level of intentional infliction of emotional distress by the Defendant.[2] There are no genuine issues as to material facts. As a matter of law the Defendant is entitled to summary judgment.

Following the issuance of both orders, Shaw filed this timely appeal.

### III. STANDARD OF REVIEW

 Shaw claims the district court erred in dismissing her claims against SGN for lack of personal jurisdiction. A recent iteration of the applicable standard of review

---

**1.** The Living Trust also references a "Marital Trust created under this agreement," but the full text of the Living Trust has not been disclosed, including the portions addressing the Marital Trust, even though the full document was the subject of a discovery request. Without access to the text of the "Marital Trust," we do not know if this document would be relevant or create a

material issue of fact. This alone raises serious doubts as to the absence of material issues of fact in this case.

**2.** Shaw abandoned her claim for intentional infliction of emotional distress on appeal.

is found in *O'Bryan v. McDonald*, 952 P.2d 636, 638 (Wyo.1998), where we stated:

> The question of in personam jurisdiction is a mixed question of law and fact that, if disputed, must be resolved before a matter can proceed. *Citibank, N.A. v. Estate of Simpson*, 290 N.J.Super. 519, 676 A.2d 172, 178 (1996). The district court has considerable leeway in deciding a pretrial motion to dismiss for lack of personal jurisdiction. *PanAmerican Mineral Svcs., Inc. v. KLS Enviro Resources, Inc.*, 916 P.2d 986, 989 (Wyo.1996). The court may determine the matter on the basis of pleadings and other materials called to its attention; it may require discovery; or it may conduct an evidentiary hearing. *Id.* The procedural path the district court chooses to follow determines the plaintiff's burden of proof and the standard to be applied on appeal.

▆▆ When the underlying facts are undisputed, the existence of personal jurisdiction is a matter of law. *Eddy v. Oukrop*, 784 P.2d 610, 612 (Wyo.1989). If the district court's determination is made without an evidentiary hearing, the plaintiff must show only a prima facie case to defeat the motion to dismiss. *Robinson v. U–Haul Intern., Inc.*, 929 P.2d 1236, 1238 (Wyo.1997) (*quoting PanAmerican Mineral Services, Inc. v. KLS Enviro Resources, Inc.*, 916 P.2d 986, 989 (Wyo.1996)); *Amoco Production Co. v. EM Nominee Partnership Co.*, 886 P.2d 265, 267 (Wyo.1994). The district court must view the allegations in the pleadings and documentary evidence in the light most favorable to the non-moving party, resolving all reasonable inferences in favor of the non-moving party. *Pelchat v. Sterilite Corp.*, 931 F.Supp. 939, 943 (D.N.H.1996); *Neways, Inc. v. McCausland*, 950 P.2d 420, 422 (Utah 1997).

▆ When material factual allegations regarding jurisdiction in the affidavits cannot be harmonized, the district court should hold an evidentiary hearing to determine the issue of jurisdiction. *Standard Tallow Corp. v. Jowdy*, 190 Conn. 48, 56, 459 A.2d 503, 507–08 (1983); *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 503 (Fla.1989); *Neways, Inc.*, 950 P.2d at 422. Once an evidentiary hearing is held, however, we will defer to the district court's findings of fact and the plaintiff will succeed upon showing, by a preponderance of the evidence, that the defendant is subject to jurisdiction. *Goodwin v. Hall*, 957 P.2d 1299, 1301 (Wyo.1998); *O'Bryan*, 952 P.2d at 638; *Robinson*, 929 P.2d at 1238; *PanAmerican Mineral Services, Inc.*, 916 P.2d at 989. No matter the procedural course charted, however, the ultimate question of whether personal jurisdiction can properly be exercised is a question of law to be reviewed *de novo*. *O'Bryan*, 952 P.2d at 638.

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Kanzler v. Renner*, 937 P.2d 1337, 1341 (Wyo.1997). A material fact is one which, if proven, would establish or refute one of the essential elements of an asserted claim or defense. *Id.* We review the record from a viewpoint most favorable to the party opposing the motion, allowing that party all reasonable inferences which may be fairly drawn from the record. *Id.*

## IV. DISCUSSION

### A. PERSONAL JURISDICTION

▆ The exercise of personal jurisdiction over a defendant is statutorily authorized on any basis consistent with the Wyoming and United States Constitutions. Wyo. Stat. § 5–1–107(a) (1997). Due process requires that the defendant have "'minimum contacts'" with the forum state such that the exercise of jurisdiction does not offend "'traditional notions of fair play and substantial justice.'" *Amoco Production Co.*, 886 P.2d at 267 (*quoting International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). In determining the limits of personal jurisdiction based on a single act, we apply the three-part test articulated in *First Wyoming Bank, N.A., Rawlins v. Trans Mountain Sales & Leasing, Inc.*, 602 P.2d 1219, 1221 (Wyo.1979) (*quoting Van Schaack & Co. v. District Court, Eighteenth J.D.*, 189 Colo. 145, 538 P.2d 425, 426 (1975) and *State ex rel.*

*White Lumber Sales, Inc. v. Sulmonetti*, 252 Or. 121, 448 P.2d 571, 574 (1968)): [3]

 "'First, the defendant must purposefully avail himself of the privilege of acting in the forum state or of causing important consequences in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'"

 █ SGN argues that it would be unfair to require it to defend an action in Wyoming because its only connection with this state is the fact that one of its officers owns a residence here. Its motion for dismissal rested solely on the affidavit of Smith, as president of SGN, that alleges SGN's only business office was in California; it is not registered to do business in Wyoming; it does not have a resident agent in Wyoming; and it does not own property nor possess any assets in Wyoming. Regarding Shaw's employment with SGN, Smith's affidavit asserted she "periodically" answered the telephone and typed letters that "sometimes happened" to be SGN related. She was paid about $500.00 per week gross, "as a matter of convenience and as an accommodation to Shaw to allow her to have spending money and health insurance coverage while she was living with [Smith]." Thus, SGN contends any contact it may have with Wyoming is predicated solely on Smith and Shaw's personal choice to live here. SGN further maintains Shaw's claims against SGN are merely ancillary to her personal dispute with Smith.

 In response, Shaw submitted her own affidavit that alleged SGN maintained an active, fully-equipped office in Jackson in the residence she shared with Smith from 1989 through 1995; SGN provided a California telephone number that rang directly in the Wyoming office and licensed two company vehicles in Wyoming; Shaw performed secretarial and office management duties from the Wyoming office for which she received a weekly paycheck in Wyoming; and that SGN

hired another employee to replace her when she was removed from the premises.

 Thus, the parties' affidavits contain contradictory statements as to whether SGN maintained an office in Wyoming, and whether Shaw's residency in Wyoming was solely a personal choice or whether it was also connected to her work for SGN. In the absence of an evidentiary hearing on these factual disputes, Shaw's allegations that SGN maintained an office in Wyoming in which she carried out her duties as an employee, and the subsequent hiring of another employee in Wyoming, clearly present a prima facie showing that personal jurisdiction over SGN is appropriate.

 █ The benchmark for determining if the exercise of personal jurisdiction satisfies due process is whether defendant's minimum contacts with the forum state are such that the defendant should reasonably anticipate being hailed into court there. *O'Bryan*, 952 P.2d at 639; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). SGN's business contacts with Wyoming, as alleged by Shaw, were sufficient to meet the first prong of the jurisdictional inquiry. It is also patent that Shaw's claim of wrongful termination is a direct consequence of SGN's decision to maintain an employee in Wyoming. Thus, Shaw met the second part of her showing that in personam jurisdiction over SGN is proper.

 Finally, "jurisdiction is proper * * * where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum state." *Burger King Corp.*, 471 U.S. at 475, 105 S.Ct. 2174. It is plainly foreseeable that a personal assistant required to live in a specific location would seek her home forum in order to litigate the merits of her employment claims. It is equally reasonable for the forum state to exercise its jurisdiction over that defendant.

 At the time the jurisdictional issues were determined, SGN argued the office in Jackson was a "home office" for Smith while he

---

3. Shaw does not allege "continuous and system- atic" contact by SGN with the State of Wyoming.

telecommuted with the office in California, and Shaw's presence in Wyoming was merely a unilateral activity. *See Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (unilateral activity cannot satisfy the requirement of contact with forum state); *Riverside & Dan River Cotton Mills v. Menefee,* 237 U.S. 189, 194–95, 35 S.Ct. 579, 59 L.Ed. 910 (1915) (residence of corporate officer, alone, insufficient to show minimum contacts); and *Bell Paper Box, Inc. v. Trans Western Polymers, Inc.,* 53 F.3d 920, 923 (8th Cir.1995) (use of interstate communications, alone, insufficient to show minimum contacts). The heart of the jurisdictional question here, however, is whether an evidentiary hearing would demonstrate that SGN made a decision to establish sufficient contacts with Wyoming by maintaining an office and/or employees within this state.

Had an evidentiary hearing been held, the district court may have had the benefit of the matters discussed in Smith's deposition testimony, submitted in support of his motion for summary judgment, where he acknowledged that Shaw was hired by SGN to act as his personal assistant and that she was told her duties as his assistant required her full-time presence in the residence and the office. It is undisputed that when Smith removed Shaw from the residence, he refused her access to the home office and hired a replacement employee.

Although SGN may not have had any contacts with Wyoming "but for" Smith's choice to live in Wyoming, it is clear that SGN's business decision to maintain an assistant in this same state renders SGN's contacts with Wyoming voluntary and not merely fortuitous. As to SGN's contention that Shaw's claims arise not from her employment, but only from the demise of a personal relationship, we cannot say as a matter of law that Smith's actions relating to the termination of Shaw and the hiring of another employee were unconnected to his position as SGN's president and Shaw's immediate supervisor. SGN voluntarily chose to employ Smith's paramour as his assistant and to maintain her employment, under Smith's supervision, in Wyoming. SGN cannot now disavow any connection with Smith's mode of personnel administration.

We, therefore, reverse the district court's dismissal of SGN from this lawsuit and remand for an evidentiary hearing in which SGN will have the opportunity to "present a compelling case that the presence of some other considerations would make the exercise of jurisdiction unreasonable." *Amoco Production Co.,* 886 P.2d at 267.

## B. SUMMARY JUDGMENT

### 1. CONTRACT CLAIMS

■■■ Shaw alleges several claims based on contract theory. She claims Smith breached an express oral contract that he would provide financial security and share the benefits accruing during their relationship in exchange for her efforts in managing and maintaining a home, raising his children, and assisting in his business endeavors. In the alternative, Shaw claims Smith breached an implied contract encompassing the same terms. Shaw also alleges breach of an express or implied agreement to enter into a joint venture or partnership in the rental properties.

■■■ It is well settled that a cohabiting couple can enter into binding contracts as long as the agreement complies with Wyoming's law of contracts. *Bereman v. Bereman,* 645 P.2d 1155, 1158 (Wyo.1982); *Kinnison v. Kinnison,* 627 P.2d 594, 595 (Wyo. 1981). The basic elements of a contract are offer, acceptance, and consideration. *Frost Const. Co. v. Lobo, Inc.,* 951 P.2d 390, 394 (Wyo.1998). Whether a contract has been formed, the exact terms of the contract, and whether there was a breach of those terms are questions of fact. *Id.; Wyoming Realty Co. v. Cook,* 872 P.2d 551, 554–55 (Wyo.1994); *Lavoie v. Safecare Health Service, Inc.,* 840 P.2d 239, 247 (Wyo.1992) (*quoting Wyoming Sawmills, Inc. v. Morris,* 756 P.2d 774, 775 (Wyo.1988)). Interpretation of the terms of an oral contract becomes a question of law only when they are shown without any conflict in the evidence. *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211, 218 (Wyo.1994). An implied contract may be created by the parties' conduct, " 'but the

conduct from which that inference is drawn must be sufficient to support the conclusion that the parties expressed a mutual manifestation of an intent to enter into an agreement.'" *Lavoie,* 840 P.2d at 248 (*quoting Continental Ins. v. Page Engineering Co.,* 783 P.2d 641, 651 (Wyo.1989)). These factual questions may be resolved by summary judgment only if reasonable minds could not differ. *Lavoie,* 840 P.2d at 248 (*quoting Continental Ins.,* 783 P.2d at 651).

Smith challenges the existence of several elements of Shaw's contractual claims. Initially, Smith contends there was no evidence of bargained-for consideration for his promise to take care of Shaw, pointing to Shaw's admission that she never specifically promised anything in return for Smith's changes to his estate plan, nor did she specifically state she would leave Smith if the trust documents were not amended. While these facts may raise questions for a jury, the combination of oral promises and the conduct of the parties during the relationship is sufficient to preclude summary judgment in Smith's favor.

Smith denies he promised Shaw they would be "business" partners, but concedes he told Shaw they would be partners in life, that he "would take care of her," and that he encouraged her to remain in the home attending to his family, household, and business needs. Smith also acknowledges there were conversations regarding Shaw's financial expectations and concerns that were the impetus for the amendments to his Living Trust and the creation of Trust #2. Although Smith insists that his promises to provide financial support were limited solely to the duration of their relationship, this is a question for a jury. Affording Shaw every reasonable inference from the record evidence, a jury could reasonably determine that Smith and Shaw bargained for his promise to provide financial protection and make her a partner in life in exchange for Shaw's efforts on behalf of Smith's family and business interests.

There is also evidence that the terms of the alleged contract were adequately certain and definite to find a "meeting of the minds." *Raymond v. Steen,* 882 P.2d 852, 856 (Wyo.

1994); *Lavoie,* 840 P.2d at 248. Shaw testified Smith told her they were "equal" partners in the relationship and that "half of everything" was hers. This, with the oral promises Smith admits he made, are sufficiently definite to present the issue to a jury.

Smith next argues that there can be no implied contract because the conduct of the parties does not demonstrate a mutual intent to share the financial benefits accruing during the relationship, nor the intent to equally control the investment properties. Smith points to the lack of jointly owned property, the absence of joint bank accounts and tax returns, the fact that Shaw retained the income from her job for her personal needs, and the fact that no partnership or joint venture tax returns were filed for the investment properties. We agree that failure to combine the parties' finances or to jointly file business tax returns may be considered as evidence refuting Shaw's claims. These facts, however, do not negate the existence of an agreement as a matter of law. Supplying services in lieu of finances may be sufficient consideration for either Shaw's claims of an agreement to share or as her contribution to the business venture. *Resource Technology Corp. v. Fisher Scientific Co.,* 924 P.2d 972, 978 (Wyo.1996) (joint venture); *Western Nat. Bank of Lovell v. Moncur,* 624 P.2d 765, 767 (Wyo.1981) (partnership); *Carroll v. Lee,* 148 Ariz. 10, 712 P.2d 923, 927 (1986) (contract to share assets).

Smith also claims that Shaw could not have equal control of the rental business necessary to imply the existence of a joint venture or partnership because Shaw was not a full trustee of the Living Trust. He further alleges that because Shaw admitted they had never directly discussed sharing the losses of the rental business, there can be no joint venture or business partnership. Shaw, however, did present evidence that tended to show the couple jointly managed funds. This includes Shaw's position as signatory to a master account into which she deposited rental payments and from which she paid household bills and upkeep on the rental properties, and her power of attorney to place money or assets in the Living Trust. Shaw also submitted an application for a

Wyoming lodging license, registered in the partnership name of Smith & Shaw, allegedly with Smith's approval. Shaw further claims she assisted in the decision making regarding the purchase of the rental properties, as well as managing the day-to-day operations of the rental business. The fact that the couple agreed to share a home may imply that the losses, as well as the profits, would be equally born by both parties.

Smith disputes many of Shaw's factual allegations, and it is clear the resolution of this controversy rests largely on the credibility of the parties; a matter particularly suited for a jury. *Semler v. Semler*, 924 P.2d 422, 424 (Wyo.1996). Affording all reasonable inferences in favor of Shaw, we find a reasonable jury could reach differing conclusions regarding the control of the enterprise or the understanding as to whether the couple would share both losses and profits. We, therefore, leave to a jury the determination of whether the parties' conduct is sufficient to show a mutual assent to an agreement and, if so, the terms of that agreement.

### 2. QUANTUM MERUIT/UNJUST ENRICHMENT

 To succeed on a claim for unjust enrichment, a plaintiff must prove (1) valuable services were provided to the defendant; (2) which were used and enjoyed by the defendant; (3) under circumstances which reasonably notified the defendant that the plaintiff expected payment; and (4) without payment the defendant would be unjustly enriched. *Adkins v. Lawson*, 892 P.2d 128, 131 (Wyo.1995) (*quoting Zitterkopf v. Bradbury*, 783 P.2d 1142, 1144 (Wyo.1989)). Smith contends this case is factually similar to *Adkins*, where we held that the plaintiff could not recover on a claim of quantum meruit because she provided her services gratuitously and, therefore, the defendant estate did not receive reasonable notification that payment was expected. *Adkins*, 892 P.2d at 132. In this case, however, the disputed facts provide sufficient evidence for a jury to reach more than one conclusion regarding Shaw's motivation for her efforts on

behalf of Smith. Smith acknowledges he promised her some benefit at the commencement of their liaison, and there is ample evidence that her expectations of financial benefit were the subject of several conversations leading to the amendment and creation of various trust documents. Thus, it becomes a question of fact whether she provided services solely out of love or with the expectation of financial compensation.

Smith also maintains Shaw cannot show that he was unjustly enriched because Shaw was paid for her assistance in his business endeavors through her SGN paychecks, pension, and other benefits, and her household services were compensated through the provision of her living accommodations. On the other hand, Shaw contends that the many household, social, and business services she provided for almost ten years were not sufficiently compensated merely by the provision of a home and food. As Shaw described the situation, after the trust documents were executed, "I worked myself crazy for him because I believed that half of everything was mine."

The record contains conflicting evidence regarding whether services provided by Shaw in relation to Smith's separate business activities were part of her job duties for SGN, or separate services performed to advance the alleged partnership between Shaw and Smith. Similarly, the extent of her efforts is contested. We, therefore, must leave to the trier of fact whether Shaw received adequate compensation for her efforts spanning the ten years of the couple's relationship.

### 3. PUBLIC POLICY

 Smith further urges this court to find that a claim based on household services rendered during cohabitation is against public policy. Citing *Willis v. Willis*, 48 Wyo. 403, 49 P.2d 670 (1935), Smith maintains Shaw may not claim reimbursement for household services under implied contract or under a theory of quantum meruit.[4] In *Wil-*

---

4. We do not see any limitation in this holding to only household services, but rather find the court's reasoning to be based on the assumption that all services provided by a wife to her husband are gratuitous. The clear dissonance between the 1935 *Willis* assumptions and our later

*lis,* we held that a woman who knowingly and voluntarily cohabits with a man cannot recover on an implied contract for services rendered him during the relationship. *Id.* at 681–82. It is clear our later decisions in *Kinnison,* 627 P.2d at 595–96 and *Bereman,* 645 P.2d at 1158 implicitly overruled *Willis,* and we now take the opportunity to expressly reject the reasoning therein.

Those courts which have held that implied contract or quantum meruit will not be enforced for "household" services, but will be enforced for commercial services, are based on the proposition that to allow recovery would effectively revive common law marriage. *See Carnes v. Sheldon,* 109 Mich.App. 204, 311 N.W.2d 747, 750–51 (1981) and *Moors v. Hall,* 143 A.D.2d 336, 532 N.Y.S.2d 412, 415 (1988). We now join the majority of jurisdictions that reject this argument. *See Glasgo v. Glasgo,* 410 N.E.2d 1325, 1332 (Ind. App.1980); *Hudson v. DeLonjay,* 732 S.W.2d 922, 926 (Mo.App.1987); *Knauer v. Knauer,* 323 Pa.Super. 206, 470 A.2d 553, 563 (1983); and *Watts v. Watts,* 137 Wis.2d 506, 405 N.W.2d 303, 309–10 (1987).

We have long rejected the validity of claims based solely on the fact that the parties cohabited for an extended period of time precisely because we do not recognize common law marriage. *Kinnison,* 627 P.2d at 595; *In re Roberts' Estate,* 58 Wyo. 438, 133 P.2d 492, 502 (1943). Despite Shaw's urging, we do not abandon that stance here. We will not, however, reject a claim based on well-established principles of contract or equity solely because the parties have cohabited. *Boland v. Catalano,* 202 Conn. 333, 521 A.2d 142, 145 (1987).

We are not persuaded by Smith's prediction that if Shaw's claims are recognized, "it will impose the obligations and responsibilities associated with marriage" and "will open the floodgates for * * * cohabiting parties" to seek a court's determination of "the precise set of facts necessary" to find an implied contract to equitably divide property. We note that the theories of implied contract and quantum meruit have been available to co-

habiting parties in Wyoming since 1980, and numerous courts have recognized the existence of an implied contract between cohabiting parties. To date, we are aware of no jurisdictions submerged in the deluge predicted by Smith. If, in fact, the application of contractual principles associated with an implied contract will impose unwanted obligations on cohabiting parties, we can only suggest that the parties refrain from conduct that implies the acceptance of such obligations or that the parties clearly identify the limits of their oral promises.

## V. CONCLUSION

Disputed issues of fact require an evidentiary hearing regarding Wyoming's exercise of in personam jurisdiction over SGN to determine Shaw's claim of wrongful termination. Considering the facts as alleged by Shaw to be true, she presented a prima facie case that jurisdiction is appropriate. We, therefore, reverse the district court's order dismissing SGN, and remand for an evidentiary hearing on the jurisdictional issue.

Viewing the record in the light most favorable to Shaw, and affording her every reasonable inference to be drawn therefrom, we find disputed issues of material fact regarding the formation and terms of an alleged contract with Smith to share in the financial benefits accruing during their relationship and the existence of a partnership or joint venture. Genuine issues of material fact also exist regarding whether Smith was given reasonable notification that Shaw expected additional compensation for her services and whether, without such compensation, Smith would be unjustly enriched. The district court's order granting summary judgment is hereby reversed and the case remanded for further proceedings in accord with this opinion.

---

holdings regarding the ability of cohabiting parties to enter into a valid contract compels the

final rejection of the *Willis* rationale.